## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                      **NO. 14-153**

**PHILIPS THOMPSON, ET AL.**                    **SECTION: "E" (4)**

### ORDER AND REASONS

Before the Court is Defendants' motions to suppress.[1] For the reasons set forth below, the motion is **DENIED**.

### BACKGROUND

The indictment in this criminal action contains drug charges against three defendants, Akari Williams ("Williams"), Kerry John Lirette, Jr. ("Lirette"), and Philips Thompson ("Thompson").[2]

On February 23, 2016, Thompson filed a motion to suppress all evidence, and any fruits thereof, obtained (1) through the May 27, 2014, search of a package, and (2) through the July 22, 2014, seizure of Thompson's cell phone.[3] The Government filed an opposition to the motion on April 26, 2016.[4] Thompson filed a reply on May 2, 2016,[5] and the Government filed a surreply on May 9, 2016.[6] The Court held a suppression hearing on May 4, 2016.[7]

---

[1] R. Doc. 67 (Philips Thompson's motion to suppress). Defendant Kerry John Lirette Jr. adopted Thompson's motion to suppress. R. Docs. 87, 94.

[2] R. Doc. 36.

[3] R. Doc. 67.

[4] R. Doc. 80.

[5] R. Doc. 86.

[6] R. Doc. 97.

[7] The final transcript of the suppression hearing will be cited to as "Tr." followed by the applicable page number.

On May 5, 2016, Lirette adopted Thompson's motion only with respect to the May 27, 2014, package search.[8]

I.  The Package

While a member of the parcel interdiction team of the San Bernardino County Sheriff's Department, Detective Holly Hague learned that the owner of the UPS store on La Sierra Avenue in Riverside, California, wanted to speak with her about the shipment of drug packages through the store.[9] Detective Hague contacted the store owner and gave her a list of indicators for packages that may contain hazardous materials or illegal narcotics and advised her to contact Detective Hague if the owner found a package she thought was suspicious.[10] In May 2012, the UPS store owner signed a confidential agreement whereby she agreed to assist the sheriff's department in the investigation of crimes.[11] The sheriff's office considered her to be a citizen informant.[12] She agreed not to disclose her association with the sheriff's department and to keep in "constant contact" with the sheriff's department while participating in any investigation.[13] Detective Hague told the UPS owner she might be compensated for her cooperation.[14]

In furtherance of this agreement, the UPS store owner reported at least eighteen suspicious parcels to the sheriff's department between March 2012 and 2015.[15] Detective Hague testified that she instructed the store owner not to open any packages.[16] Of the

---

[8] R. Docs. 94, 98.
[9] R. Doc. 80-8 at 1.
[10] *Id.*
[11] Tr. at 16. *See also* R. Doc. 106-5.
[12] Tr. at 15.
[13] R. Doc. 106-5; Tr. at 17.
[14] Tr. at 23.
[15] *Id.* at 19.
[16] *Id. See also* R. Doc. 106-8 at 1 ("I advised the female UPS store owner if she received a parcel for shipment that she felt was suspicious and might contain illegal narcotics not to open the parcel, and to call me, and I would conduct a parcel investigation utilizing my narcotics detection K9.").

eighteen parcels the UPS store owner reported between March 2012 and 2015, ten were reported to Detective Hague prior to the May 2014 search of the package at issue in this case.[17] Detective Hague testified that the store owner had not opened any of the ten packages reported to and seized by Detective Hague.[18] The sheriff's department paid the UPS store owner for reporting suspicious packages on five occasions between July 2014 and April 2015.[19] Detective Hague testified the owner also was paid several times between May 2012 and February 2013, though Detective Hague was not able to locate the records for those payments.[20]

On May 27, 2014, the UPS store owner contacted Officer Kristina Winegar, a deputy assigned to the narcotics division/parcel interdiction team in the Sheriff's Department in the County of San Bernardino, California, about a "suspicious package."[21] The UPS store owner told the deputy that a black male entered the UPS store and paid $90 to have the package shipped to Houma, Louisiana.[22] According to the deputy's police report, "[d]ue to the [cost of shipping the package] and suspicious behavior of the suspect," the store owner opened the package and found a container wrapped in cellophane.[23] The store owner smelled a chemical order and resealed the box.[24] The

---

[17] Tr. at 19. Detective Hague was a member of the parcel interdiction team until 2013. *See* Tr. at 14.

[18] *Id.* at 19. The eight other suspicious packages the UPS store owner reported to the San Bernardino Sheriff's Department between March 2012 and 2015 were seized by other officers. *Id.* at 19–20. There is no evidence that the UPS store owner opened any of those packages. Defendants bear the burden of proving a violation of their Fourth Amendment rights. If they had any evidence the UPS store owner opened other packages, it was Defendants' responsibility to bring the evidence before the Court.

[19] Tr. at 21; R. Doc. 106-9.

[20] Tr. at 22.

[21] R. Doc. 106-3 at 1.

[22] *Id.* at 3.

[23] *Id.* There is some dispute about whether the owner or another employee contacted the sheriff's department. Special Agent John Traverse stated in a report that while one employee informed Officer Winegar of the suspicious package, another employee opened the package. R. Doc. 67-5 at 1. At the suppression hearing, however, he testified that when the store owner saw photographs of the package, "she seemed to remember being the one that actually opened the package." Tr. at 128.

[24] R. Doc. 106-3 at 3.

sender of the package, who provided the UPS store with the name "Sam Niel" and a Louisiana phone number, listed "John Lirette" in Houma as the recipient.[25] The shipper used the UPS store address as the return address for the package.[26]

After Officer Winegar arrived at the UPS store, she took the package to the UPS hub in San Bernardino.[27] She said in her police report that she searched "the data base [sic] for the name Sam Niel with no local listed."[28] Officer Winegar then called another detective from the San Bernardino County Sheriff's Department, who brought in a dog to conduct a K-9 sniff of the package.[29] The K-9 gave a positive alert "directly on the box," indicating the box contained illegal narcotics.[30] Officer Winegar obtained a search warrant and opened the package.[31] Inside was a container wrapped in cellophane, and inside that container was a paint can.[32] The paint can contained about three pounds of a "white crystal substance believed to be methamphetamine."[33]

On May 28, 2014, Officer Winegar contacted Agent Ronald McKay with the Terrebonne Narcotics Task Force in Houma, Louisiana, to set up a controlled delivery of the package.[34]  On May 29, 2014, Agent McKay received the package.[35] Agent McKay contacted another agent to arrange for a K-9 sniff of the package.[36] The K-9 gave a positive alert on the shipped package, and Agent McKay subsequently obtained a search warrant

---

[25] *Id.*; R. Doc. 106-1.
[26] R. Doc. 106-1.
[27] R. Doc. 106-3 at 3.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* at 3–4.
[34] *Id.* at 4.
[35] R. Doc. 106-17 at 2.
[36] *Id.*

to open the package.[37] Agent McKay and Terrebonne Task Force Agent Russell Hornsby, Jr. opened the package, and a field test of the crystal substance yielded "a presumptive positive result for the presence of methamphetamine."[38]

The package was addressed to a residence for which the listed resident was Kerry John Lirette, Jr., though the property was owned by Williams.[39] On May 29, 2014, Agent McKay obtained a search warrant for the home to which the package was addressed.[40] On May 30, 2014, officers conducted a controlled delivery of the package.[41] Lirette received the package at his residence, the location to which the package was addressed, and then took the package to Williams' residence.[42] Agent McKay then obtained a search warrant for Williams' residence.[43] After officers received an alert that the package had been opened, the Terrebonne SWAT team entered Williams' residence and secured the package and people inside, including Lirette and Williams.[44] Lirette and Williams were arrested, and Agents with the Terrebonne Task Force and Louisiana State Police searched Williams' residence.[45] Agent Hornsby seized Williams' phone, and other members of the Terrebonne Task Force seized the drugs.[46]

The San Bernardino Sheriff's Department subsequently notified the UPS store owner that the "suspicious package" contained illegal narcotics and provided the UPS

---

[37] *Id.*
[38] *Id.* at 4.
[39] *Id.* at 4. *See also* R. Doc. 98 at 1 ("There is no dispute that the package was delivered to a home that was rented and occupied by Lirette, but owned by Akari Williams.").
[40] R. Doc. 106-17 at 4.
[41] *Id.* at 5–6.
[42] *Id.*
[43] *Id.* at 6.
[44] *Id.*
[45] *Id.*; Tr. at 86–87.
[46] Tr. at 87; R. Doc. 106-17 at 8.

employee with a one-time $100 payment in connection with this package, according to Agent Hornsby's report.[47]

## II. The Cell Phone

Terrebonne Task Force officers obtained a warrant to search Williams' phone.[48] A search of the phone revealed Williams exchanged text messages, including some exchanged on May 27, 2014, with the phone number provided by the sender in San Bernardino that appeared on the package label.[49] Agent Hornsby testified that, based on his investigation of Williams' phone, he believed the phone number with which Williams exchanged these text messages was the phone number of the package's sender.[50]

Terrebonne Task Force officers learned through the issuance of a subpoena that the phone number provided by the package's sender was listed under the name "Rio Thompson" and under an address at which Philips Thompson resided "at one time."[51] Agent Hornsby testified the phone number also matched the number Thompson provided officers "as his number" in connection with a separate arrest in 2013.[52] The agents then obtained a judge-issued order authorizing the officers to get a GPS coordinate for the phone in order to determine its location.[53] Using cell phone tower pings, the agents were able to determine the phone was in the Southwest Airlines terminal at the Los Angeles International Airport on July 22, 2014.[54] After contacting Southwest Airlines, the officers

---

[47] R. Doc. 106-18 at 2.
[48] Tr. at 87.
[49] *Id.* at 87, 90–94.
[50] *Id.*
[51] *Id.* at 93.
[52] *Id.*
[53] *Id.* at 94.
[54] *Id.*

learned that Thompson was scheduled for a flight from Los Angeles to New Orleans on July 22, 2014.[55]

Agent Hornsby then applied for a warrant for Thompson's cell phone from a state-court judge in Terrebonne Parish.[56] In the affidavit for the search warrant, Agent Hornsby stated that he planned to "intercept Thompson at the New Orleans airport" and "seize the described cell phone."[57] Agent Hornsby included in the warrant application the serial number and AT&T service account number associated with Thompson's phone.[58] The warrant was signed by the judge in Terrebonne Parish on July 22, 2014.[59]

Agents Hornsby, Michael Greaves, and Jeffrey Neves went to the New Orleans International Airport before Thompson's flight was scheduled to land.[60] The agents testified they observed Thompson with a cell phone while at the airport after he landed.[61] Agent Hornsby testified that he provided the warrant to Thompson and Thompson gave Agent Hornsby the phone.[62] Agent Hornsby then returned to Terrebonne Parish and put the phone in a department-issued safe.[63] The next day, he retrieved the phone to bring it back to the New Orleans area.[64]

On July 23, 2014, Task Force Officer Julio Alvarado obtained a warrant in Jefferson Parish to search the phone.[65] In the warrant application, Alvarado did not mention that officers had obtained a warrant issued in Terrebonne Parish to seize and

---

[55] *Id.*
[56] R. Doc. 106-24 at 1; R. Doc. 106-14; Tr. at 94–95. Terrebonne Parish is the 32nd Judicial District of the State of Louisiana.
[57] R. Doc. 106-21 at 3.
[58] *Id* at 2; Tr. at 95.
[59] R. Doc. 106-21 at 1.
[60] *Id.*
[61] Tr. at 97, 136, 139, 143.
[62] *Id.* at 99.
[63] *Id.*
[64] *Id.*
[65] *Id.*; R. Doc. 106-15.

search the cell phone.[66] The warrant was signed by a Jefferson Parish state-court judge on July 23, 2014. The warrant provided details of the phone, including the serial number, the model, and the associated AT&T account number.[67] After the issuance of the warrant, the Jefferson Parish Forensic Data Unit retrieved data from Thompson's phone.[68]

## STANDARD OF LAW

The Fourth Amendment expressly imposes two requirements: (1) all searches and seizures must be reasonable, and (2) "[a] warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."[69] "Warrantless searches are presumptively unreasonable."[70] The exclusionary rule forbids the use of evidence obtained in violation of the Fourth Amendment.[71] The rule prohibits such use "not because the evidence is not probative, or to chastise errant law officers or to benefit the accused, but to compel respect for the guaranty of the Fourth Amendment 'in the only effectively available way—by removing the incentive to disregard it.'"[72] Accordingly, "where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'"[73]

As a general rule, the proponent of a motion to suppress must prove by a preponderance of the evidence that the evidence in question was obtained in violation of

---

[66] *See* Tr. at 99; R. Doc. 106-15. The affidavit in support of the Jefferson Parish search warrant states, "On Tuesday[,] July 22, 2014, Agent Hornsby intercepted Thompson at the New Orleans airport upon his return flight and informed Thompson of the investigation that was being conducted and [Thompson] subsequently provided the described cell phone to Agent Hornsby in order to cooperate with the ongoing investigation." R. Doc. 106-15 at 2. The affidavit suggests that Thompson voluntarily gave Agent Hornsby his cell phone and makes no mention of the Terrebonne Parish search warrant. *Id.*

[67] *See id.* at 4.

[68] R. Doc. 106-24 at 3.

[69] *Kentucky v. King*, 563 U.S. 452, 459 (2011).

[70] *United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir. 1992).

[71] *United States v. Otero*, 176 F.3d 479 (5th Cir. 1999) (per curiam).

[72] *United States v. Ragsdale*, 470 F.2d 24, 30 (5th Cir. 1972) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)).

[73] *Davis v. United States*, 564 U.S. 229, 237 (2011) (alteration in original) (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).

his or her Fourth Amendment rights.[74]  In the case of a warrantless search or seizure, the burden shifts to the Government to prove by a preponderance of the evidence that its actions were constitutional.[75]

## ANALYSIS

First, Thompson contends the warrantless search of the package in San Bernardino County by the UPS store owner violated the Fourth Amendment and thus any fruits from the search must be suppressed.[76] Second, Thompson argues the evidence discovered as a result of the seizure of his cell phone should be suppressed because it was based on an invalid warrant.[77]

Lirette has adopted Thompson's motion to suppress with respect to the warrantless search in San Bernardino by the UPS store owner.[78]

### I.   The Search of the Package in San Bernardino

#### A.   *"Standing" under the Fourth Amendment*[79]

A defendant seeking suppression has the burden of establishing he has standing under the Fourth Amendment.[80] That is, the defendant must show "that he has a privacy or property interest in the premises searched or the items seized which is sufficient to

---

[74] *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014).

[75] *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

[76] R. Doc. 67-1 at 6–11.

[77] *Id.* at 12–15.

[78] R. Doc. 98 at 1.

[79] The Supreme Court in *Rakas v. Illinois* "dispens[ed] with the rubric of standing" in determining "whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure." *Rakas v. Illinois*, 439 U.S. 128, 140 (1978). The Court explained that "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined[,] concept of standing." *Id.* at 139. "Nevertheless, the term 'standing' has been used by courts since *Rakas* as shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

[80] *Iraheta*, 764 F.3d at 461 ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."); *United States v. Wilson*, 36 F.3d 1298, 1302 (5th Cir. 1994); *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

justify a reasonable expectation of privacy therein."[81] Courts apply a two-pronged inquiry to assess whether a defendant has standing: "[A] defendant's standing [under the Fourth Amendment] depends on (1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place [or object] being searched or items being seized, and (2) whether that expectation of privacy is one which society would recognize as objectively reasonable."[82] "Such an expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis."[83]

### 1. *Philips Thompson*

The Government argues in its opposition that Thompson lacks standing to object to the search.[84] The Government contends that, because Thompson "intentionally distanced himself from the package" by using an alias to ship the package, he forfeited any objectively reasonable expectation of privacy for the package.[85]

Although the Government and Thompson dispute whether any expectation of privacy Thompson may have had was objectively reasonable, neither addresses whether Thompson had an actual, subjective expectation of privacy.[86]

---

[81] *United States v. Pierce ("Pierce II")*, 959 F.2d 1297, 1303 (5th Cir. 1992) (internal quotation marks omitted).

[82] *Iraheta*, 764 F.3d at 461 (internal quotation marks omitted).

[83] *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994).

[84] R. Doc. 80 at 5–8.

[85] *Id.*

[86] The Government does not that Thompson "forfeited his standing to challenge any search [of the package]" because he "intentionally distanced himself from the package" to "obscure his identity as the sender and avoid criminal liability." R. Doc. 80 at 5. The Government also noted, "[a]s the mailer of this package, he could have asserted his control and ownership, but chose not to do so." *Id.* Although the Government later argues that, "[a]ny subjective expectation of privacy is not one that society deems reasonable," *id.* at 8, the Government never addresses whether Thompson had an actual, subjective expectation of privacy in the package.

To establish standing, the defendant must satisfy the subjective prong of the Fourth Amendment standing analysis.[87] That is, the defendant must demonstrate an actual, subjective expectation of privacy with respect to the place or object searched or item seized—that he had a privacy or possessory interest in the object of the search.[88] "A defendant who fails to demonstrate a sufficiently close connection to the relevant places or objects will not have standing to a claim that they were illegally searched or seized."[89]

In *United States v. Pierce*, the Fifth Circuit explained, "Arguably, a defendant who is neither the sender nor the addressee of a package has no privacy interest in it, and, accordingly, no standing to assert Fourth Amendment objections to its search."[90] In *Pierce*, it was uncontested that a package containing cocaine was neither sent by nor addressed to the defendant.[91] The court found it significant with respect to the standing analysis that the defendant "continually attempted to disassociate himself from the package."[92] The defendant denied ownership of the package and argued at a preliminary hearing that he had never been in possession of the package.[93] "At no point . . . has [the defendant] ever attempted to establish, much less prove, any privacy interest in the package."[94] Accordingly, the Fifth Circuit concluded that the defendant lacked standing to challenge the search of the package because he failed to establish an actual, subjective privacy interest in the package: "Indeed, [the defendant's] only admitted interest in

---

[87] *Iraheta*, 764 F.3d at 461.
[88] *See, e.g., United States v. Riazco*, 91 F.3d 752, 754 (5th Cir. 1996); *Pierce II*, 959 F.2d at 1303.
[89] *Lewis*, 40 F.3d at 1333 (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991)); *Pierce II*, 959 F.2d at 1303).
[90] *Pierce II*, 959 F.2d at 1303.
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*

suppressing the package and its contents is to avoid its evidentiary force against him, an interest not protected under the Fourth Amendment."[95]

In *United States v. Lewis*, the First Circuit held that the defendants lacked standing to assert a Fourth Amendment challenge because the defendants failed to show they had an actual, subjective expectation of privacy in the seized items.[96] The court explained that the defendants "failed to assert any privacy interest in the seized contraband."[97] The court explained that "[i]t may well be that [the defendants] had a reasonably expectation of privacy in the contraband, but if so, they failed to assert it in support of their motion to suppress."[98] While the First Circuit panel "appreciated that [the defendants] may have feared that any interest they may have claimed in the contraband would be used against them at trial," the court recognized it is well-established that "testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence."[99]

---

[95] *Id.* (quoting *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988)) (internal quotation marks omitted).

[96] *Lewis*, 40 F.3d at 1333.

[97] *Id.*

[98] *Id.*

[99] *Id.* (internal quotation marks omitted). The Supreme Court held in *United States Simmons* that testimony given by a defendant in support of a motion to suppress evidence on Fourth Amendment grounds cannot be admitted as evidence of his guilt at trial. *United States v. Simmons*, 390 U.S. 377, 394 (1968). The Court reached its holding in *Simmons* in light of a dilemma defendants may face: "either to give up what he believe[s] . . . to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." *Id.* This dilemma arises because "a defendant charged with a possessory offense might only be able to establish his standing to challenge a search and seizure by giving self-incriminating testimony admissible as evidence of his guilt." *United States v. Salvucci*, 448 U.S. 83, 89 (1980). In *Simmons*, the defendant was charged with bank robbery. *Simmons*, 390 U.S. at 380. Police searched the home of his co-defendant's mother and found a suitcase with items similar to those used in the bank robbery. *Id.* at 380–81. The defendant unsuccessfully moved to suppress the suitcase. *Id.* In support of his motion, the defendant provided testimony establishing that he was the owner of the suitcase. *Id.* At trial, the Government used the testimony against the defendant on the issue of guilt. *Id.* The Supreme Court held that the defendant's testimony used to support his motion to suppress was inadmissible at trial on the issue of guilt. The Court recognized that there are cases in which a defendant's testimony is necessary to establish standing. *Simmons* was one such case, the Court noted, as the defendant was not in the home that was searched at the time the suitcase was seized and "[t]he only, or at least most natural, way in which he could [establish] standing to object to the admission of the suitcase was to testify that he was its owner." *Id.* at 390–91. The Court concluded it was "intolerable" for defendants to decide

Thompson "bears the burden of establishing standing to challenge [the] search under the Fourth Amendment—that he has a privacy or property interest in the [package] searched . . . which is sufficient to justify a reasonable expectation of privacy therein."[100] Thompson has failed to meet his burden to establish an actual, subjective expectation of privacy in the package, as he has not attempted to demonstrate that he had a privacy or possessory interest in the package. Thompson did not testify at his suppression hearing.[101] In his reply memorandum in support of his motion to suppress,[102] Thompson made arguments regarding the objective prong—whether any actual, subjective expectation of privacy the sender of a package has is one that society would recognize as objectively reasonable. But he made these arguments "*[w]ithout* conceding that Mr. Thompson had *any involvement* in the underlying conduct alleged by the Government."[103] Thompson's arguments addressed only the second, objective prong of the standing framework—whether any expectation of privacy the sender may have had is one that society would recognize as objectively reasonable. Thompson failed to address the first, subjective prong—whether he had an actual, subjective expectation of privacy in the package. Although the Government expressly challenged only whether any expectation of privacy Thompson may have had is objectively reasonable, "[t]he proponent of a motion to suppress has the burden of establishing that his *own* Fourth Amendment rights were violated by the challenged search or seizure."[104]  Thompson cannot establish that his *own*

---

whether to surrender his constitutional right against self-incrimination in order to assert his constitutional rights under the Fourth Amendment. *Id.* at 393–94.

[100] *Pierce II*, 959 F.2d at 1333.

[101] *See* R. Docs. 112, 113.

[102] Thompson did not address standing in his memorandum in support of his motion to suppress. R. Doc. 67-1. After the Government challenged Thompson's standing in its opposition to Thompson's motion, Thompson addressed his standing under the Fourth Amendment for the first time in his reply memorandum in support of his motion.

[103] R. Doc. 86 at 2 (emphasis added).

[104] *Iraheta*, 764 F.3d at 461 (emphasis added).

Fourth Amendment rights were violated unless he establishes that he had an actual, subjective expectation of privacy in the package.[105] While "it may well be that [Thompson] had a reasonable expectation of privacy in the [package]," like the defendants in *Lewis*, Thompson "failed to assert it in support of [his] motion to suppress,"[106] as he did not concede he sent the package or "had *any involvement* in the underlying conduct alleged by the Government."[107] Thompson's "only . . . interest in suppressing the package and its contents is to avoid its evidentiary force against him, an interest not protected under the Fourth Amendment."[108] Because "Fourth [A]mendment protection is accorded only to a person who has [an actual, subjective] privacy interest in the area searched,"[109] the Court finds Thompson lacks standing to challenge the search of the package under the Fourth Amendment.[110]

   2.  *Kerry John Lirette, Jr.*

The Government has not challenged Lirette's standing to challenge the search of the package.[111] "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable."[112] An addressee of packages or other closed containers "can reasonably expect that the government will not open them."[113] The Fifth

---

[105] *See id.*

[106] *See Lewis*, 40 F.3d at 1333.

[107] R. Doc. 86 at 2 (emphasis added).

[108] *Pierce II*, 959 F.2d at 1303 (internal quotation marks omitted).

[109] *United States v. Richards*, 638 F.2d 765, 769 (5th Cir. 1981).

[110] Thompson fails to establish the subjective prong of the standing analysis. Accordingly, the Court need not reach the objective prong.

[111] At the suppression hearing, the assistant United States attorney ("AUSA") conceded that "Mr. Lirette has a much stronger standing argument [than Mr. Thompson]." *See* Tr. at 3–4. The AUSA also stated he and counsel for Lirette "may be able to reach an agreement" on the issue of standing. *Id.* at 4. The AUSA objected only to the timeliness of Lirette's motion. *Id.*

[112] *United States v. Jacobsen*, 466 U.S. 109, 114 (1984).

[113] *Villarreal*, 963 F.2d at 774.

14

Circuit has held that "individuals may assert a reasonable expectation of privacy in packages addressed to them [even] under fictitious names."[114] The intended recipient of a package clearly has "an adequate possessory or proprietary interest in the . . . object searched to give [him] standing to question the propriety of its search or seizure."[115]

The package searched was addressed to "John Lirette."[116] At the suppression hearing, counsel for Lirette stated that Lirette "was named as a recipient" of the package.[117] The package was addressed to a residence for which the listed resident was Kerry John Lirette, Jr.[118] As the listed recipient of the package, Lirette had an actual, subjective expectation of privacy in the package that was objectively reasonable.[119] Accordingly, the Court finds that Lirette has standing to challenge the search of the package under the Fourth Amendment.

### B. Constitutionality of the Search

If government agents open containers sent by mail or private carrier, they must satisfy the requirements of the Fourth Amendment.[120] The Fourth Amendment proscribes only governmental action.[121] "[I]t is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official."[122] "The

---

[114] *Id.*

[115] *United States v. Jacobsen*, 683 F.2d 296, 298 n.2 (8th Cir. 1982), *rev'd on other grounds*, 466 U.S. 109 (1984) (internal quotation marks omitted). *See also Richards*, 638 F.2d at 770 ("The package was sealed and addressed to Mehling, which, in effect, was Richards. These facts alone indicate an expectation that the contents would remain free from public examination." (internal quotation marks omitted)).

[116] R. Doc. 106-1.

[117] Tr. at 3.

[118] R. Doc. 106-17 at 4. *See also* R. Doc. 98 at 1 ("There is no dispute that the package was delivered to a home that was rented and occupied by Lirette, but owned by Akari Williams.").

[119] *Iraheta*, 764 F.3d at 461 (internal quotation marks omitted).

[120] *Villarreal*, 963 F.2d at 774.

[121] *Jacobsen*, 466 U.S. at 113.

[122] *Id.* (internal quotation marks omitted).

Fourth Amendment can be violated by a search conducted by a private party acting as an agent or instrument of the government."[123]

Lirette argues that the warrantless package search violated his Fourth Amendment rights because the UPS store owner who opened the package was acting as an agent for the Government at the time of the search.[124]

The Fifth Circuit on several occasions has applied the Ninth Circuit's test to determine whether a private party is acting as an agent or instrument of the government.[125] The Ninth Circuit has identified two factors critical to determining whether a private party is an instrument or agent of the government: "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends."[126] The movant has the burden to establish both factors in order to show the private party acted as a government agent or instrument.[127]

With respect to the first factor, "de minimis or incidental contacts between the citizen and law enforcement agents . . . will not be subject to Fourth Amendment scrutiny."[128] Courts have "required evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship."[129] There must be some evidence of government participation in or affirmative encouragement of the

---

[123] *United States v. Pierce ("Pierce I")*, 893 F.2d 669, 673 (5th Cir. 1990). *See also Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971).
[124] R. Doc. 67-1 at 6–11.
[125] *See, e.g., United States v. Blocker*, 104 F.3d 720, 725 (5th Cir. 1997); *Pierce I*, 893 F.2d 669, 673–74; *United States v. Bazan*, 807 F.2d 1200, 1202–04 (5th Cir. 1986).
[126] *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982). *See also United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981).
[127] *See Miller*, 688 F.2d at 657–58; *Pierce I*, 893 F.2d 669, 673–74; *United States v. Jarrett*, 338 F.3d 339, 345 (4th Cir. 2003); *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003); *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987).
[128] *Miller*, 688 F.2d at 657.
[129] *Jarrett*, 338 F.3d at 345.

private search before the court will apply the Fourth Amendment to it.[130] "In some affirmative way, the police must instigate, orchestrate, encourage or exceed the scope of the private search to trigger application of the Fourth Amendment."[131] The defendant must come forward with evidence that "signal[s] affirmatively that the Government would be a ready and willing participant in an illegal search."[132]

In *United States v. Walther*, the Ninth Circuit recognized that "there exists a 'gray area' between the extremes of overt governmental participation in a search and the complete absence of such participation."[133] The resolution of cases that fall within this "gray area," the court explained, should be resolved on a case-by-case basis.[134]

One case that fell within the "gray area" is *United States v. Gudal*.[135] In *Gudal*, a police informant overheard the defendant boast about his marijuana plants growing on his property.[136] Before notifying the police, however, the informant entered the defendant's property to confirm the presence of marijuana.[137] He cut a lock on a barn on the defendants' property and detected a strong smell of growing marijuana and a bright light, indicating the defendant was indeed growing marijuana.[138] The informant then told the police, who confirmed the defendant resided on the property and that the defendant's high electricity usage was consistent with the running of many Halide lamps.[139] The Ninth Circuit affirmed the district court's denial of the defendant's motion to suppress.[140] The

---

[130] *Id. See also Miller*, 688 F.2d at 657; *Walther*, 652 F.2d at 791–92.
[131] *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996) (citing *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir.), *cert denied*, 474 U.S. 1034 (1985)).
[132] *Jarrett*, 338 F.3d at 347.
[133] *Walther*, 652 F.2d at 791.
[134] *Id.*
[135] *United States v. Gudal*, 980 F.2d 739 (9th Cir. 1992).
[136] *Id.* at *1.
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] *Id.* at *2–3.

Ninth Circuit explained that the informant was not acting as a government agent or instrument at the time of his search of the defendant's property.[141] The Ninth Circuit found it relevant that the district court determined "the police had no prior knowledge of the informant's detective work and had done nothing to encourage that kind of activity. In fact, the contract with the informant expressly stated that he was to do no such thing."[142] The Ninth Circuit also noted that the informant "had never done anything like this before, and there was no evidence to show that he was emboldened by any assurance that his picaresque activities would be overlooked."[143] The court concluded that the police did not engage in any wrongdoing, as "[t]hey did not directly or indirectly cause the intrusion upon [the defendant's] property. That they were made aware of [the defendant's] own illegal activity as a result of someone else's does not justify suppression of this evidence."[144]

Lirette has failed to establish that the Government knew of and acquiesced in the intrusive conduct of the UPS store owner. According to Officer Winegar's report, a UPS employee informed her that "the box was open due to UPS policy."[145] UPS's policy provides in relevant part: "UPS reserves the right in its sole discretion to open and inspect any package tendered to it for transportation."[146] Detective Hague testified unequivocally at the suppression hearing that prior to the search she instructed the UPS store owner not to open any packages and that doing so "would have been contrary to [her] directive."[147]

---

[141] *Id.*
[142] *Id.* at *2.
[143] *Id.* at *3.
[144] *Id.*
[145] R. Doc. 106-3 at 3.
[146] R. Doc. 106-10 at 16.
[147] Tr. at 19–20 ("Q. Have you instructed her not to open the packages? A. Yes, sir."). *See also id.* at 40 ("Q. Did you provide any directive regarding what to do when packages were seized or she suspected a suspicious package? A. Yes. Q. What were those instructions? A. To call me directly and to put the package in the area where—at the back of the store where they put the packages to be picked up at the end of the day and to not

There was no evidence that the sheriff's department knew the UPS store owner had ever opened packages she suspected contained drugs. Although Detective Hague testified that she paid the owner several times prior to the search of the package at issue,[148] Detective Hague also testified that the owner had not opened any of the ten parcels to which the UPS store owner previously alerted Detective Hague.[149] She also testified that the sheriff's department had no supervision over the owner, whom Detective Hague referred to as a "citizen informant."[150] Moreover, although the sheriff's department paid the UPS store owner $100 after the search of the package led to the three defendants' arrests,[151] "[s]uch after-the-fact conduct cannot serve to transform the prior relationship between [the owner] and the Government into an agency relationship with respect to the search of [the package]."[152]

The evidence establishes the San Bernardino Sheriff's Department did not participate in or affirmatively encourage the UPS store owner's opening of the package.[153] Indeed, a UPS employee told Officer Winegar the package was opened pursuant to UPS's policy.[154] There was no indication to the San Bernardino Sheriff's Department that the UPS store owner had opened suspicious packages prior to notifying detectives on previous occasions. Thus, there was no acquiescence on part of the sheriff's department even though it paid the store owner for alerts relating to suspicious packages that were later

---

open the package."); *id.* at 47 ("Q. And you also told her very clearly that she was not to open the packages on her own, correct? A. Yes, sir.").

[148] *Id.* at 22.

[149] *Id.* at 19 ("Q. And based upon your report, you personally seized ten of those parcels? A. Yes. Q. How many of those ten contained narcotics? A. All ten, sir. Q. Had she opened the packages? A. No, sir.").

[150] *Id.* at 15–16, 41.

[151] *See* R. Doc. 106-9.

[152] *See Jarrett*, 338 F.3d at 346.

[153] *See Miller*, 688 F.2d at 657; *Walther*, 652 F.2d at 791–92.

[154] R. Doc. 106-3 at 3.

discovered to contain narcotics.[155] Lirette has failed to provide evidence showing that the sheriff's department affirmatively was "a ready and willing participant in an illegal search."[156] Accordingly, the evidence fails to establish that the government knew of and acquiesced in the intrusive conduct, and the Court need not reach the second factor.

Lirette has failed to demonstrate that the UPS store owner was acting as a government agent or instrument when she opened the package. Because the Fourth Amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government,"[157] Lirette's Fourth Amendment rights were not violated by the search. The motion to suppress based on the UPS store owner's search of the package is denied.

## II. The Seizure and Search of Thompson's Cell Phone

Thompson argues his cell phone was unlawfully seized and therefore any evidence from the phone should be suppressed.[158] Thompson contends that the officers who seized his phone relied on a warrant that was invalid because the judge who signed the warrant lacked jurisdiction in Jefferson Parish and because the affidavit in support of the warrant request was otherwise "rife with problems."[159]

Agent Hornsby obtained a search warrant from a state-court judge in Terrebonne Parish for the phone agents believed to be the phone of the individual who sent the package.[160] Under Louisiana law, "a judge may issue a warrant authorizing the search for

---

[155] *See Gudal*, 980 F.2d at *3 (finding relevant that the informant "had never done anything like this before, and there was no evidence to show that he was emboldened by any assurance that his picaresque activities would be overlooked").
[156] *See Jarrett*, 338 F.3d at 347.
[157] *Id.* (internal quotation marks omitted).
[158] R. Doc. 67-1 at 12–15.
[159] *Id.* at 12.
[160] Tr. at 70. *See also* R. Doc. 106-15 at 1.

and seizure of any thing within the territorial jurisdiction of the court . . . ."[161] A search conducted outside of the jurisdiction of the issuing court violates the Louisiana Code of Criminal Procedure.[162] The seizure of Thompson's cell phone occurred at the Louis Armstrong New Orleans International Airport, which is located in Jefferson Parish. Therefore, the warrant executed by the state-court judge in Terrebonne Parish could not validly authorize the search or seizure of Thompson's phone in Jefferson Parish.

"Generally, warrantless searches are justifiable only if they fall under one of the specifically established and well-delineated exceptions to the general warrant requirements."[163] The Government raises three exceptions to the general warrant requirement to support its contention that the evidence resulting from the search and seizure of Thompson's phone should not be suppressed: (1) the good-faith exception; (2) the plain-view exception; and (3) the inevitable-discovery exception.[164]

Although the Court finds the seizure of the phone was permissible under the plain-view exception, the Court first addresses the Government's argument that the officers were entitled to rely on the warrant from Terrebonne Parish in good faith.

A. *The Good-Faith Exception*

The Government contends the evidence from Thompson's phone should not be suppressed because the officers relied in good faith on the authority of the state-court judge in Terrebonne Parish to issue the warrant.[165]

---

[161] LA. CODE CRIM. P. art. 161. "[W]hen a state officer secures a search warrant from a state judge, Federal Rule of Criminal Procedure 41(a) is not the rubric for determining whether the search warrant was issued by an appropriate court even when the seized evidence is offered in federal court. State law controls in that instance." *United States v. Conine*, 33 F.3d 467, 469 (5th Cir. 1994).

[162] *State v. Matthieu*, 506 So. 2d 1209, 1210 (La. 1987) ("[T]he search was conducted outside the jurisdiction of the issuing court and was violative of Code Crim.P. art. 161.").

[163] *United States v. Garza*, 921 F.2d 59, 60 (5th Cir. 1991).

[164] R. Doc. 80 at 14−24.

[165] *Id.* at 15−18.

The purpose of the exclusionary rule is to deter police misconduct.[166] "Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."[167] The Supreme Court thus created a good-faith exception to the exclusionary rule in *United States v. Leon*.[168] Under the exception, evidence obtained during the execution of a warrant later determined to be deficient is nonetheless admissible if the executing officer's reliance on the warrant was objectively reasonable and made in good faith.[169] For the good-faith exception to apply, the executing officer's reliance on the issuing judge's probable-cause determination and the technical sufficiency of the warrant must have been objectively reasonable.[170]

Several federal courts have held that a search warrant signed by a person who lacks the authority to issue it is void as a matter of law.[171] As the Sixth Circuit explained, "we are confident that *Leon* did not contemplate a situation where a warrant is issued by a person lacking the requisite legal authority. *Leon* presupposed that the warrant was issued by a magistrate or judge clothed in the proper legal authority, defining the issue as whether the exclusionary rule applied to 'evidence obtained by officers acting in reasonable reliance on a search warrant *issued by a detached and neutral magistrate* but

---

[166] *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006).

[167] *United States v. Leon*, 468 U.S. 897, 919 (1984) (quoting *Michigan v. Tucker*, 417 U.S. 433, 447 (1974)).

[168] *Id.*

[169] *United States v. Woerner*, 709 F.3d 527, 533 (5th Cir. 2013).

[170] *United States v. Gibbs*, 421 F.3d 352, 358 (5th Cir. 2005).

[171] *See, e.g., United States v. Krueger*, 809 F.3d 1109, 1115–17 (10th Cir. 2015); *United States v. Master*, 614 F.3d 236, 239 (6th Cir. 2010) ("[W]hen a warrant is signed by someone who lacks the legal authority necessary to issue search warrants, the warrant is void ab initio."); *United States v. Levin*, No. CR-15-10271, 2016 WL 2596010, at *8 (D. Mass. May 5, 2016); *United States v. Houston*, 965 F. Supp. 2d 855, 902 (E.D. Tenn. 2013) ("A search warrant issued by an individual without the legal authority to do so is 'void *ab initio*,' which means that the Court never reaches the question of whether the search warrant is supported by probable cause." (citation omitted)).

ultimately found to be unsupported by probable cause.'"[172] Thus, if there is no legal authority for the issuance of the warrant, the good-faith exception cannot apply.

There is no dispute that the state court in Terrebonne Parish could not authorize a search or seizure in Jefferson Parish. On the basis of the invalid warrant, Agent Hornsby, Agent Neves, and Agent Greaves seized Thompson's cell phone at the airport in Jefferson Parish.[173] At the suppression hearing, Agent Hornsby testified that he obtained a warrant from a judge in Terrebonne Parish intending to seize Thompson's phone at the airport, which he knew was located outside of Terrebonne Parish.[174] At the time he executed the warrant, Agent Hornsby had been a police officer for more than fourteen years and six months and had been assigned to the narcotics division for more than ten years and six months.[175] The Court finds a reasonably well-trained officer would have known that a warrant issued by a judge in Terrebonne Parish was not valid under Louisiana law to authorize a search or seizure in Jefferson Parish.[176] The agents should have ensured they had a valid warrant to seize Thompson's phone before doing so. In addition to Agent Hornsby's testimony, Agent Neves testified that he knew the airport was in Jefferson Parish and that the warrant was executed by a judge in Terrebonne Parish.[177] Agent Greaves testified he did not review the search warrant used to seize Thompson's phone at all.[178] The Court finds the officers were, at the very least, grossly negligent in executing a Terrebonne Parish warrant in Jefferson Parish. Applying the exclusionary rule in this case would be consistent with the policy underlying the rule, as the exclusionary rule serves to

---

[172] *United States v. Scott*, 260 F.3d 512, 515 (6th Cir. 2001) (emphasis in original).
[173] *See* Tr. at 135–37.
[174] *Id.* at 71.
[175] R. Doc. 106-21 at 3.
[176] *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003) (quoting *Leon*, 468 U.S. at 922 n.23).
[177] Tr. at 137.
[178] *Id.* at 142.

deter not only deliberate or reckless conduct but also grossly negligent conduct.[179] The good-faith exception does not apply to the seizure of Thompson's phone, as the state court in Terrebonne Parish could not authorize the seizure in Jefferson Parish.

### B. The Plain-View Exception

The Government argues that, even if the phone was seized without a valid warrant, Thompson's motion to suppress should be denied pursuant to the plain-view exception.[180]

The plain-view exception applies if the Government establishes three factors by a preponderance of the evidence: (1) the officer is lawfully in the position from which he or she views the evidence; (2) the incriminating nature of the evidence is immediately apparent; and (3) the officer has a lawful right of access to the evidence.[181] In *Coolidge v. New Hampshire*, the Supreme Court described the exception in detail:

> What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused— and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plan view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.[182]

The first and third factors are clearly met in this case. The officers were at the airport near baggage claim when they seized Thompson's phone.[183] All three officers present during the seizure testified at the suppression hearing that they each observed

---

[179] *Herring v. United States*, 555 U.S. 135, 144 (2009).
[180] R. Doc. 80 at 18–22.
[181] *United States v. De Jesus-Batres*, 410 F.3d 154, 159 (5th Cir. 2005).
[182] *Coolidge*, 403 U.S. at 466.
[183] *See* Tr. at 96–100, 135–37, 139–41.

Thompson using a cell phone, and only one cell phone, and thus that the phone was in plain view.[184]

With respect to the second factor, "[t]he incriminating nature of an item is immediately apparent if the officers have probable cause to believe that the item is either evidence of a crime or contraband."[185] Probable cause does not require certainty; "[a] practical, nontechnical probability that incriminating evidence is involved is all that is required."[186] The Court "consider[s] the totality of the circumstances, including the officers' training and experience and their knowledge of the situation at hand."[187] The seizure of property in plain view is presumptively reasonable, assuming there is probable cause to associate the property with criminal activity.[188]

The Government argues that the incriminating nature of Thompson's phone was immediately apparent to the officers because they had probable cause to believe Thompson's phone was evidence of the crime.[189] After the officers arrested Williams and Lirette, they seized Williams' cell phone.[190] Officers obtained a warrant to search Williams' phone and found several text messages exchanged with the number that appeared on the package label.[191] On May 27, 2014, Williams received a text message from

---

[184] Tr. at 97 ("[Agent Hornsby:] At this time, I believed that was the phone that was being utilized to convey the package being delivered. Q. Did you observe him with this phone? A. Yes, sir, I did. Q. Did you see him use any other phone? A. No, sir. Q. Only one phone in his possession at any time? A. Yes, sir."); *id.* at 136 ("Q. As far as the cell phone that you observed [at the New Orleans airport], how many cell phones did you see [Thompson] in possession of? [Agent Neves:] I just observed one."); *id.* at 139, 143 ("Q. When you got to [the] New Orleans airport, what, if anything, did you see there? . . . As he approached, did you see his cell phone? A. He had his cell phone in his hand. . . . [Q.] How many cell phones did Philips Thompson have at the airport? A. I observed him to have one cell phone. Q. Is that the cell phone that you seized? A. That was the cell phone that Agent Hornsby took custody of, yes, sir.").
[185] *United States v. Conlan*, 786 F.3d 380, 388 (5th Cir. 2015) (internal quotation marks omitted).
[186] *Texas v. Brown*, 460 U.S. 730, 742 (1983). *See also Waltman v. Payne*, 535 F.3d 342, 347 (5th Cir. 2008).
[187] *Waltman*, 535 F.3d at 347.
[188] *Brown*, 460 U.S. at 741–42.
[189] R. Doc. 80 at 19–22.
[190] Tr. at 87.
[191] *Id.* at 87, 90–91.

that phone number that said, "You say you want that brown, right?"[192] Agent Hornsby testified that he believes "brown" refers to UPS "because UPS is commonly brown in color."[193] Williams received another text asking, "To what address?"[194] Williams replied, "The last one for John Lirette."[195] Williams then received a text message with the tracking number that was associated with the package.[196] Agent Hornsby testified that, based on his investigation of Williams' phone, he believed the phone number with which Williams exchanged these text messages was the phone number of the package's sender.[197]

Officers subsequently learned the phone was listed under the name "Rio Thompson" and under an address at which Philips Thompson resided "at one time."[198] Further, the phone number matched the number Thompson provided officers "as his number" in connection with a separate arrest in 2013.[199] A judge subsequently authorized the officers to obtain a GPS coordinate for the phone in order to determine its location.[200] Using cell phone tower pings, the agents were able to determine the phone was in the Southwest Airlines terminal at the Los Angeles International Airport on July 22, 2014.[201] After contacting Southwest Airlines, the officers learned that Thompson was scheduled for a flight from Los Angeles to New Orleans on July 22, 2014.[202]

The officers then went to the New Orleans International Airport before Thompson's flight was scheduled to land. When Thompson exited the plane, Agent Neves

---

[192] *Id.* at 91.
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.* at 92.
[197] *Id.*
[198] *Id.* at 93.
[199] *Id.*
[200] *Id.* at 94.
[201] *Id.*
[202] *Id.*

testified that he observed Thompson pull a cell phone out of his pocket.[203] Agent Neves followed Thompson to baggage claim.[204] Agents Hornsby and Greaves testified they also observed Thompson with the phone.[205] Agent Hornsby testified, "At this time I believed that was the phone that was being utilized to convey the package being delivered."[206]

Considering the totality of the circumstances, including the officers' training, experience, and knowledge of the situation at hand,[207] the Court finds the Government had probable cause to believe that the phone was evidence of the mailing of illegal narcotics. Although "the intrinsic nature of a cell phone does not immediately give suspicion that it is associated with criminal behavior," the facts available to agents "at the time included the knowledge that [Thompson] had sent and received incriminating messages on his cell phone."[208] The agents' testimony was sufficient to show that Thompson sent text messages to Williams about the package, and the agents could reasonably infer that the only phone Thompson had in his possession at the New Orleans airport was the phone used to send those messages.[209] Accordingly, the Government has

---

[203] *Id.* at 136.

[204] *Id.*

[205] *Id.* at 98, 139.

[206] *Id.* at 97.

[207] *See Waltman*, 535 F.3d at 347.

[208] *See United States v. Lewis*, No. 14-CR-6, 2015 WL 1884375, at *4 (W.D. Ky. Apr. 24, 2015). *See also Conlan*, 786 F.3d at 388 ("As a threshold matter, the governing standard demands not that items be 'inherently incriminating,' but that their incriminating nature be 'immediately apparent.' . . . That standard was met because . . . the lead investigator who instructed an officer to seize the items[] was aware of [the defendant's] harassing electronic communications.").

[209] *See Conlan*, 786 F.3d at 388; *United States v. Key*, No. 13-CR-726, 2016 WL 454323, at *3 (Feb. 5, 2016) ("[The officer's testimony] was sufficient to show a link between the illegal activity of prostitution and telephones when he stated he had seized them in previous prostitution investigations as evidence based on the backpage ads. That statement and the fact that he stated he was seizing evidence of prostitution allows the factfinder to make the reasonable inferences necessary to link the phones to prostitution and to the specific prostitution of this victim."). *Cf. United States v. Davis*, 787 F. Supp. 2d 1165, 1172–73 (D. Or. 2011) (concluding the plain-view exception did not justify the search of a cell phone, as "the incriminating nature of the cell phone was not immediately apparent" because the officer "did not suspect that defendant was involved in drug-trafficking, where cell phones are often tools of the drug trade").

met its burden to show by a preponderance of the evidence that the incriminating nature of Thompson's phone was immediately apparent to the agents at the airport.

The Court finds that, although the agents could not rely on the warrant signed by a state-court judge in Terrebonne Parish to seize Thompson's phone in Jefferson Parish, the plain-view exception applies, and evidence from the search and seizure of the cell phone will not be suppressed.[210]

**CONCLUSION**

For the foregoing reasons;

**IT IS ORDERED** that Defendants' motion to suppress is **DENIED**.[211]

**New Orleans, Louisiana, this 27th day of June, 2016.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[210] Accordingly, the Court need not reach the issue of whether the inevitable-discovery exception applies.
[211] R. Doc. 67.